*In re* CURTIS YOUNG, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* CURTIS YOUNG, Respondent-Appellant.)

First District (5th Division)    No. 78-684

Opinion filed June 22, 1979.

James J. Doherty, Public Defender, of Chicago (Zaven Peter Tokatlian and Frances Sowa, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Carol A. Kearney, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Respondent appeals from an adjudication of wardship after a finding of delinquency for the offense of aggravated battery. (Ill. Rev. Stat. 1973, ch. 38, par. 12—4(a).) On appeal, respondent contends that: (1) the alleged offense was not established beyond a reasonable doubt; and (2) the State failed to prove he committed the offense before his 17th birthday. We affirm. The pertinent facts follow.

A petition for adjudication of wardship was filed on June 21, 1976, alleging that respondent had committed aggravated battery on a Chicago police sergeant. The petition also alleged respondent was born on July 15, 1960. In his first court appearance respondent told the judge that he was 15 years old. The State sought a section 2—7 transfer (Ill. Rev. Stat. 1975, ch. 37, par. 702—7) to permit prosecution of respondent as an adult. At the hearing on this motion, the judge stated respondent was 15 years old and no objection was made to this statement. After a hearing, the court denied the State's motion to transfer respondent for criminal prosecution.

The following pertinent testimony was adduced at the adjudicatory hearing.

*For the State*

Chicago police sergeant James Malcotte testified. At about 3:05 a.m.

on June 17, 1976, he was stopped in a marked squad car westbound on Washington at Oakley Street when he heard what he believed to be two gunshots. He radioed the police department, reported what he heard, and proceeded to investigate. He went north on Oakley to an alley, and then east down the alley which was behind 2245 West Lake Street. He stopped in the rear of a building and exited the squad car. He walked east and went around the corner of the building where he was confronted by two male Negroes who were a foot or two from him. He observed that the taller wore a dark green jacket, dark pants, had short hair, and was 5′8″ to 5′10″ tall. The other was 5′7″ to 5′8″, wore dark clothing and had short hair. He observed their faces for "a second" before he was shot in the middle right thigh by the taller one. At trial, he indicated that respondent looked like the man who shot him.

After being shot, he fell around the corner of the building, got up, and pursued the two assailants who were running towards a building at 2245 West Lake Street. They turned and fired at him, and he returned fire. After firing his third shot, Sergeant Malcotte saw the taller assailant fall. He was unable to continue pursuit and radioed that he had been shot. He also gave descriptions of the attackers. He was taken to a hospital where he remained a week. On June 20, 1976, while in the hospital, he viewed a lineup. He identified respondent as the taller of his assailants and another person as the other.

On cross-examination Sergeant Malcotte admitted that there was some doubt in his mind that respondent was his attacker and that there was doubt when he identified respondent at the lineup. On redirect, he testified that he was sure that respondent looked like the person who shot him.

Jose Williams testified. He was in his girlfriend's apartment, number 1208 in the building at 2245 West Lake, shortly after 3 a.m. on June 17, 1976, when he heard a loud noise. He looked out the window towards the alley and saw "Curtis Young and Ricky shooting." He identified respondent as the person he saw shooting. There were two lights in the alley and two more on the side of a gymnasium. Williams at first stated he observed respondent from a distance of about 200 yards but then corrected himself and said about 200 feet.

When he looked out his window he saw an unmarked police car pull into the alley. He could see only the front end of the police car since the back end was behind the gymnasium. He saw a police officer jump out and shout "Help, police." Ricky and Curtis were about 10 feet from the officer. The officer came around the corner of a building and was shot by Curtis. The officer fell face down and Ricky and Curtis ran away, firing at the officer as they ran. They disappeared into the building at 2245 West Lake between apartments 101 and 102.

The next morning at about 9 a.m. Ricky and Curtis came to Williams'

girlfriend's apartment and told him "Be careful * * *. We shot a police officer last night. And if anybody asks you anything, you ain't heard nothing, seen nothing."

Williams had known respondent for about seven months, having seen him in his building every day. He had also "got high" three times with respondent.

On cross-examination Williams testified that he had not had anything to drink from 6 p.m. until 3 a.m. on June 16-17, 1976. That night he had stopped by apartment 102 where a Mr. Price lived. He had a can of beer and maybe some wine before he left at 7:30 p.m. Mr. Price accompanied him upstairs.

Williams spoke to the police the next day and said that he heard shots and saw two Negroes running but he did not know who they were. Later in a signed statement, he told police that a third individual named Danny was standing in the hallway with a sawed-off gun. He denied being told that his fingerprints had been found on a gun.

He testified that when the officer got out of the car he had a gun in his hand and was about 6 feet from the two men. They began running and fired back at the officer and he fell. The officer fired back but Williams did not see anyone fall. The two men ran into the building between apartments 101 and 102 and entered one of the two.

Williams admitted that he was on probation for attempt robbery. He also said that his girlfriend's apartment had been burglarized recently and that he suspected respondent and Ricky had committed the offense.

On redirect, Williams said that he did not initially tell police that respondent and Ricky were responsible because he feared for the safety of his family. It was after he moved from the building that he told the police. The third individual whom Williams had mentioned was not in the alley but was standing in the hallway.

There was a stipulation that Chicago police officers Parks and Steward would state that they were at a lineup and that people in court were also in the lineup.

Chicago police sergeant Robert Keating testified. On June 17, 1976, he went to the vicinity of 2245 West Lake Street to investigate the shooting of Sergeant Malcotte. He stated that there were six lights on top of that building and they all face the area between the alley and the building. The alley is lit by regular fluorescent lamps and the lighting is good at that point. The building is 175 to 200 feet from the scene of the shooting and a person running from the alley to apartments 101 and 102 would have to move toward apartment 1208. Sergeant Keating had been in apartment 1208 and noted that it had a clear, unobstructed view of the alley and the area behind the building. He was also present on June 19, 1976, when Investigator

Walton took a statement from Jose Williams and no one told Williams that his own fingerprints had been found on a recovered gun.

On cross-examination Sergeant Keating stated that a gun had been dusted for fingerprints in connection with the investigation. Also, a footprint from a sneaker had been found near the scene of the shooting. The building is about 300 feet high and apartment 1208 is about 200 feet from the ground. From the bedroom window one could not see the Lake Street entrance or the entrance to apartment 101 or 102.

On redirect, the witness stated that the entrances to apartments 101 and 102 could be seen from the living room of apartment 1208. It would take about 3 to 4 seconds to run from the bedroom to the living room.

Chicago police investigator Eldge Walton testified. On June 19, 1976, he spoke with Jose Williams concerning his investigation of the shooting. He did not tell Williams that fingerprints had been found on the gun involved with the shooting.

Respondent made a motion for a directed finding which was denied.

*For the Defense*

James Wade testified. He lives at 2245 West Lake in apartment 1112. On June 17, 1976, at about 3 a.m. he heard a shot and went to his kitchen. He heard three more shots and looked out the window towards the alley. He saw two people running and one on the ground. He could not tell who they were or whether one was a police officer because it was dark in the back and too far from his apartment. He could see that one of the people running was wearing a white jacket. He also said that from the window he was looking out, it is impossible to see the entrance to apartment 102.

On cross-examination he stated that he first spoke to the police at about 4:40 a.m. when they brought him off a bus. They informed him that a policeman had been shot. He told them that he had seen two people run into a gangway. At trial, he stated that that gangway led to apartments 101 and 102. He stated that he had never seen respondent before.

Allen Price testified. He lives at 2245 West Lake, apartment 102, and had known respondent for about 5 years. He also had known Jose Williams for about 1½ years. On June 16, 1976, at about 9 p.m., he, Jose Williams, respondent, and other children were in the apartment. He and Williams had been drinking since 5:30 p.m. and had consumed 3 or 4 quarts of beer and a couple quarts of wine. He went with Williams to his apartment door and returned about 11:45 p.m. He stated that Williams was intoxicated. When he returned respondent was watching television in the living room. When the show ended at 12:30 a.m., the others went to bed and Price took the television into the bedroom and continued to watch the television.

Respondent was sleeping on a couch in the living room. At about 3 a.m. he heard two or three "pop sounds" and he went to the living room to look. At that time he saw respondent sleeping. He returned to the bedroom and watched television until 5 a.m. To his knowledge, respondent did not leave the apartment that night. At 5 a.m. a police officer knocked at the door and asked if Price had heard shots and he answered that he had. Respondent was still asleep at this time.

Price stated that a week before trial he had a conversation with Williams about some money Williams owed him. Williams told him that he was a witness in the present case and that the police had arrested him at work and had found his fingerprint on a gun. Williams said he did not want to take the blame and so he had to testify.

On cross-examination Price testified that respondent was the cousin of the woman with whom he lives and that respondent stayed at Price's apartment once or twice a week. He stated that on the night of the shooting, respondent wore a green shirt and black pants. Respondent slept through the shootings, a police officer's pounding on the door which was 6 feet away, and a visit by Price's father at about 6:30 a.m. He also stated that Williams' girlfriend had told him that Williams had been arrested on the Friday after the shooting. He said that Williams did not tell him that he had been arrested.

Miltonia Cook testified. She lives at 2245 West Lake Street, apartment 102, with Allen Price and her nine children. On June 17, 1976, when she awoke at about 8 a.m., respondent, Price and the children were at home. Respondent was sleeping on the couch in the living room. He slept until about 11 a.m. Respondent is her cousin and stays at her house frequently.

On cross-examination she stated that when she went to bed at about 1 a.m. on June 17, 1976, respondent was asleep on the couch and Price was watching television in the bedroom.

Sergeant Keating testified for the State in rebuttal. On June 17, 1976, at about 4:30 a.m. he was canvassing the building at 2245 West Lake Street for witnesses to the shooting. He went to apartment 102, banged on the door and announced, "Police officers." He received no response, banged on the door very loudly and yelled, "Police officers. Open the door. This is the police." He continued this for five minutes but received no response.

Both sides rested. The judge informed both sides that he intended to visit the scene of the crime and the other premises. Neither side had an objection to this procedure. The judge reported that he took a very brief look at the scene from his car and did not make a detailed inspection.

After closing arguments, the court found respondent to be a delinquent and adjudicated him a ward of the court.

A motion to vacate the finding or in the alternative for a new trial was

denied. The trial court committed respondent to the Department of Corrections and this appeal followed.

OPINION

## I.

Respondent contends that he was not proved guilty beyond a reasonable doubt. He asserts that since Sergeant Malcotte was unable to positively identify him, the finding of delinquency rests solely upon the testimony of Jose Williams. Respondent contends that Williams' prior conviction, his possible motive to fabricate (revenge for the burglary of his apartment), and numerous contradictions between his testimony and that of the other witnesses thoroughly destroyed his credibility as a witness, making his testimony unreliable. In addition, it is argued that Williams' testimony should be viewed with skepticism since he was allegedly arrested for the shooting and would attempt to exonerate himself.

It is well established that the positive identification of a single eyewitness, if credible, is sufficient to prove guilt beyond a reasonable doubt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) It is equally clear that it is the duty of the trial court to determine the credibility of witnesses and unless the evidence is so palpably contrary to the verdict as to raise a reasonable doubt, the judgment should not be reversed. (*People v. Manion.*) A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or credibility of witnesses. (*People v. Manion.*) With these principles in mind, we will examine respondent's contentions.

Several of the inconsistencies in the testimony noted by respondent are minor and involve details not critical to the question of guilt. The most serious doubts regarding Williams' credibility were raised by the differing versions of his drinking on the night in question, his possible desire for revenge, and his opportunity to see the events from his window. The first two questions deal solely with the credibility of the witnesses and the weight accorded to their testimony. These were weighed by the trial court and resolved against respondent.

■■ The witness' ability to see deals with both credibility and his opportunity to see. Respondent submits that James Wade, an impartial witness living a floor below Williams, testified that he could not recognize the persons he saw below because it was too dark and too far from his apartment. In contrast, Williams testified that he could see the area clearly. Respondent apparently suggests that because Wade could not see clearly, neither could Williams. However, the testimony of other witnesses shows

that Williams had an ample opportunity to view the area and observe respondent. Williams' testimony regarding the lighting condition was corroborated by Sergeant Keating, who noted six lights between the alley and the building and additional lights in the alley. After being in Williams' apartment, he noted that there was a clear, unobstructed view of the alley and the area behind the building. The trial judge, who made a cursory survey of the scene, would be able to assess Williams' opportunity to observe the area from his window. Finally, the fact that Williams had known respondent for a period of seven months, would explain his ability to identify respondent, in contrast to Wade, who did not know him. We conclude that Williams had an ample opportunity to make a positive identification.

■■ Relying on *People v. Wilson* (1977), 66 Ill. 2d 346, 362 N.E.2d 291, and *In re Brown* (1977), 49 Ill. App. 3d 580, 364 N.E.2d 657, *aff'd* (1978), 71 Ill. 2d 151, 374 N.E.2d 209, respondent argues that because there was testimony that Williams had been arrested in connection with this offense, his testimony should be viewed with skepticism since it would not only implicate respondent but also exonerate himself. *Wilson* involved uncorroborated identification testimony of an admitted accomplice, which can be sufficient to support a conviction. Likewise, *In re Brown* involved uncontradicted evidence that the State's witness had been arrested for the murder. In this case, Williams' possible arrest was a defense theory. The only evidence of an arrest came from defense witnesses and was denied by all prosecution witnesses. It was a matter of credibility of the witnesses and was apparently resolved against respondent.

■■ Respondent contends that there was no proof that he had access to a gun, and although a gun recovered in connection with the shooting was dusted for fingerprints, it was not introduced into evidence. He argues that this suggests his prints were not on the gun. It is unclear from the record whose gun was recovered in the investigation. When Sergeant Keating attempted to testify regarding the fingerprints, defense counsel objected. There was no further testimony on this subject, and defendant did not attempt any cross-examination on this point. The positive and credible testimony of Jose Williams established that respondent shot Officer Malcotte. The failure to produce a weapon or to introduce the fingerprint report does not raise a reasonable doubt as to respondent's guilt in view of Williams' testimony.

■■ Finally, respondent contends in addition to the State's weak case, respondent's alibi witnesses were unimpeached, thus raising a reasonable doubt of his guilt. As already discussed, the State's case was sufficient to sustain the conviction. The trier of fact is not obligated to believe alibi testimony over that positively identifying the accused even where the alibi

testimony is given by the greater number of witnesses. (*People v. Setzke* (1961), 22 Ill. 2d 582, 177 N.E.2d 168; *People v. Bolden* (1978), 59 Ill. App. 3d 441, 375 N.E.2d 898.) The State's rebuttal witness, Sergeant Keating, testified that he knocked on the apartment door where respondent was allegedly sleeping and received no response. This would rebut Price's testimony that he answered the door and spoke with the police. The trial court did not accept respondent's alibi. Viewed as a whole, the evidence is not so palpably contrary to the verdict as to raise a reasonable doubt of respondent's guilt.

## II.

Respondent's second contention is that the State failed to prove at the adjudicatory hearing that respondent committed the offense before his 17th birthday. He contends that since the proof of his age was not made during a formal hearing and was not made under oath, the proof was insufficient. In addition, any statements made by respondent concerning his age were made at a hearing before a judge other than the one who presided over the adjudicatory hearing. Therefore, respondent contends that since no formal proof regarding his age was made at the adjudicatory hearing or any formal hearing, the finding of delinquency must be reversed.

■■■ He relies on the cases of *In re Brown* (1977), 49 Ill. App. 3d 580, 364 N.E.2d 657, *aff'd on other grounds* (1978), 71 Ill. 2d 151, 374 N.E.2d 209, and *In re Eicher* (1978), 59 Ill. App. 3d 1021, 376 N.E.2d 697, *rev'd sub nom. In re Greene* (1979), 76 Ill. 2d 204, 390 N.E.2d 884, which found that the age of a respondent in a delinquency hearing is an element to be proved by the State beyond a reasonable doubt. However, in the recent case of *In re Greene* (1979), 76 Ill. 2d 204, 390 N.E.2d 884, the supreme court held that age is not an element which must be proved beyond a reasonable doubt in order to support an adjudication of delinquency. Rather, age is the factor which authorizes the application of the Juvenile Court Act. (Ill. Rev. Stat. 1977, ch. 37, par. 701—1 *et seq.*) Once an allegation that respondent is under 17 years of age is made in the petition for adjudication of wardship, it is incumbent on respondent to challenge the authority of the court to proceed against him as a minor or be deemed to have consented to the juvenile proceedings. *In re Greene.*

■■ In the instant case the petition for adjudication of wardship alleged that respondent was 15 years of age. Respondent entered only a general denial of the petition. Therefore, he did not place his age or the court's authority to proceed in issue and thereby consented to the court's authority, waiving any objection on this point. *In re Greene.*

Since the finding of delinquency was proved beyond a reasonable doubt and respondent has waived his objection to the lack of proof of his age, the judgment of the trial court is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.