THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DEMETRIUS WOODS, Defendant-Appellant.

First District (1st Division)    No. 78-409

Opinion filed October 29, 1979.

Ralph Ruebner and Susan Solovy, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Myra J. Brown, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Demetrius Woods, was convicted by a jury of the offenses of armed robbery, aggravated battery and aggravated kidnapping (Ill. Rev. Stat. 1973, ch. 38, pars. 18—2, 12—4, 10—2) and sentenced to concurrent terms of 10-30 years for armed robbery, 10-30 years for aggravated kidnapping and 3-10 years for aggravated battery. The offenses charged were committed 3 days before, and defendant was arrested 5 days after, his 17th birthday. Defendant appeals, contending:

(1) because he was only 16 years old at the time of these offenses, he was denied his due process right to a meaningful juvenile transfer hearing when juvenile court proceedings did not begin until 27 months after his arrest; (2) this delay deprived him of his constitutional right to a speedy trial; (3) he was prosecuted on a void indictment; (4) the trial court erred by not suppressing defendant's statement; and (5) the trial court improperly sentenced defendant to the adult division of the Department of Corrections.

We affirm.

Because defendant does not contest the sufficiency of the evidence, only a brief account of the incident is necessary.

On November 18, 1974, Murray Hartstein, complainant, was driving north on Lake Shore Drive in Chicago when a spotlight flashed into his car and he heard the command, "pull over, police" two times. He obeyed and reached for his wallet in order to produce his driver's license. At this point, two men ran up to Hartstein. One grabbed his wallet and the other pointed a gun at him. Hartstein identified defendant as the person who took his wallet. Defendant then ordered Hartstein over to his car and handcuffed him. Defendant took the gun from the second assailant. He pushed Hartstein into the front passenger seat of Hartstein's vehicle and got into the back seat. Another man got into the driver's seat and they proceeded northbound. The third man followed in the assailant's car.

After driving for a short time, both cars stopped and defendant pulled Hartstein out of the car. Defendant and the driver of the assailant's car dragged Hartstein toward a lagoon. While handcuffed, Hartstein was beaten by both men, thrown to the ground and kicked on his body, face and left eye. Complainant incurred serious, persisting injuries. Defendant and the other men then fled in both cars.

Defendant's constitutional arguments necessitate a detailed account of the proceedings. The offenses took place on November 18, 1974. On November 21, 1974, defendant became 17 years old. Defendant was arrested on November 26, 1974. He was indicted by a grand jury in January of 1975. Numerous continuances and several pretrial motions followed. During these delays, defendant was out on bond. In February of 1977, William S. Clark, Jr., became defendant's new attorney. On February 14, 1977, he filed a motion to dismiss the indictment, alleging that defendant was 16 at the time of the offense, but was not being prosecuted under the Juvenile Court Act. This motion was denied. On February 24, 1977, the cause was transferred to juvenile court.

On March 16, 1977, the State filed a petition for adjudication of wardship in the interest of defendant concerning the offenses that were the basis of the grand jury indictment. On March 24, 1977, defendant

filed a petition for discharge, alleging that defendant's constitutional right to a speedy trial had been denied. Defendant testified in conjunction with the petition that after he was arrested and taken to the police station he told the officers his correct date of birth. He further testified that he posted bond and made court appearances once or twice a month. He was employed and missed work due to these court appearances. On cross-examination, defendant testified that during the 27 months since his arrest he had been represented by counsel. On redirect examination, defendant stated that Mr. Clark had been representing him for two or three months. Clark was the attorney who first raised the issue of defendant's age. The juvenile court denied defendant's petition for discharge.

That same day (March 16, 1977) the State made a motion to permit prosecution of defendant under the criminal laws. (Ill. Rev. Stat. 1977, ch. 37, par. 702—7.) On May 5, 1977, a juvenile transfer hearing was held. The parties stipulated that there was probable cause the defendant committed the offenses charged and that defendant was indicted for those offenses in January 1975.

Probation Officer Moore testified concerning defendant's juvenile record: Defendant was referred to the juvenile court for burglary on October 29, 1970, and received six months supervision, which was satisfactorily terminated on April 29, 1972. On March 22, 1971, he was referred for battery and received six months probation which was unsatisfactorily terminated on October 19, 1971. On July 9, 1971, defendant was referred for armed robbery and battery. He entered an admission as to both offenses and was committed to the Department of Corrections, mittimus stayed. On December 31, 1971, he was referred for theft and two counts of battery and was committed "bodily" to the Department of Corrections. Defendant was paroled in November of 1974. The instant offenses and defendant's arrest also occurred in November 1974.

Moore further testified that defendant was presently living at home, employed at a fish market, and studied auto mechanics in the M.E.D.S. program. Moore stated that if defendant were 16 years old he would recommend his referral to U.D.I.S. (Unified Delinquency Intervention Service, a division of the Department of Corrections), but that due to defendant's age the juvenile court could provide no appropriate services.

The parties stipulated that Herman Smith, defendant's accomplice, was arrested for the same offenses and was not transferred from the juvenile court.[1]

---

[1] Defendant wishes us to consider the disparate treatment of his accomplice, Herman Smith. The record is silent as to Smith's ultimate juvenile disposition, personal history and juvenile record. For that reason, the fact that Smith was not transferred will not be considered in our determination of this case.

Diane Lopez, a social worker for the Criminal Defense Consortium, testified on defendant's behalf. She had a counseling relationship with Woods since April 5, 1977, which consisted of six interviews. She testified that defendant had realistic goals—completing the G.E.D. (high school equivalency test) and an auto mechanics course and joining the army. With further counseling she believed he could attain these goals.

The juvenile court was also apprised by the State that while defendant was out on bond he had been convicted of an offense in adult court and was currently sentenced to probation.

The State's transfer motion was granted.

Defendant next filed several pretrial motions in the circuit court of Cook County, criminal division. These included a petition for discharge and a motion to suppress statements. In his petition for discharge, defendant again made allegations as to prejudice occasioned by delay in his treatment under the Juvenile Court Act. Both motions were denied.

Defendant's first argument is that the 27-month delay before his transfer to the juvenile court amounted to a denial of his due process right to a proper transfer hearing as required by *Kent v. United States* (1966), 383 U.S. 541, 16 L. Ed. 2d 84, 86 S. Ct. 1045, and as codified in the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 702—7). Defendant contends that at the time of his transfer it was impossible to obtain a meaningful hearing because he was already 19.

■■ The State concedes that defendant's initial prosecution as an adult was improper. Under the Juvenile Court Act, no minor under 17 at the time of an alleged offense may be prosecuted in criminal court without the State first petitioning the juvenile court for his transfer. (Ill. Rev. Stat. 1977, ch. 37, par. 702—7; *People v. Rahn* (1974), 59 Ill. 2d 302, 319 N.E.2d 787.) Upon the discovery of this error, the State undertook the correct procedure of transferring the cause to juvenile court.

■■ The Illinois Constitution provides that all circuit courts have original jurisdiction over all justiciable matters with two exceptions not here relevant. (Ill. Const. 1970, art. 6, §9.) The juvenile court is a division of a single, unified circuit court (*People v. Jiles* (1969), 43 Ill. 2d 145, 251 N.E.2d 529), and it is the circuit court as a whole which is vested with jurisdiction. (*People v. Nichols* (1978), 60 Ill. App. 3d 919, 922, 377 N.E.2d 815.) Whether a person is tried in juvenile or criminal court is a matter of procedure. (*People v. Shaw* (1972), 3 Ill. App. 3d 1096, 279 N.E.2d 729.) When defendant's age was raised as a defense to criminal prosecution, the proper procedure was to transfer the case from the criminal to the juvenile court. This was done here. See *People v. Gooden* (1977), 56 Ill. App. 3d 408, 371 N.E.2d 1089.

■■ We also note that a defendant may waive the right to be tried in the juvenile court by failing to raise age as an issue. (*People v. Washington*

(1966), 81 Ill. App. 2d 90, 225 N.E.2d 472; *cf. In re Young* (1979), 73 Ill. App. 3d 629, 392 N.E.2d 229 (once allegation that respondent is under 17 years of age is made in petition for adjudication of wardship, it is incumbent on respondent to challenge authority of court to proceed against him as a minor or be deemed to have consented to juvenile court proceedings).) Neither the criminal trial court nor the prosecution noticed that the offense took place 3 days prior to defendant's 17th birthday. This fact only became apparent some 2 years after defendant's arrest, after 16 continuances agreed to by defendant or at his request. This issue was raised more than 2 months after William Clark became defendant's new attorney. Accordingly, we are of the opinion that defendant has waived any objection to the delayed filing of a delinquency petition and that the State acted correctly once defendant's age was affirmatively established. But even if there were no waiver, defendant's due process challenge that because he was 19 years old it was impossible for him to obtain a meaningful transfer hearing is without merit.

The evidence at the transfer hearing is stated above in detail. The parties stipulated that there was sufficient evidence for an indictment (probable cause). Probation Officer Moore testified concerning defendant's extensive juvenile court record, including felony adjudications. Indeed, defendant had been paroled from the Department of Corrections, juvenile division, the same month he committed the present offenses. Moore stated that his dispositional recommendation would be commitment to the Department of Corrections due, in part, to defendant's violation of parole. Moore was of the opinion that because of defendant's age and background the juvenile division could provide no services to him.

From the record it appears that the statutory prerequisites for transfer (Ill. Rev. Stat. 1977, ch. 37, par. 702—7(3)(a)(1-6)) would have been established by the State two years earlier, at the time defendant was 17. There was ample evidence to establish probable cause and the aggressive premeditated nature of the offenses. Complainant was seriously injured, robbed at gunpoint and kidnapped in his own car. Furthermore, defendant's record of juvenile offenses was extremely bad. Additionally, age would hardly serve as a mitigating factor because defendant was three days short of his 17th birthday on the date of the offense and age 17 serves as the upper limit for juvenile delinquency jurisdiction (Ill. Rev. Stat. 1977, ch. 37, par. 702—2). Defendant's only colorable argument is that at age 17 he might have found juvenile facilities appropriate for treatment and rehabilitation. We find this prospect unlikely since his juvenile record and probation and parole violations indicate he had run the gamut of available juvenile services with little

success. Any shortcomings by the juvenile court concerning defendant's transfer hearing did not prejudice his due process rights.

Defendant next contends that he was deprived of his constitutional right to a speedy trial. The sixth amendment to the United States Constitution requires that, in all criminal prosecutions, the accused shall enjoy the right of a speedy trial. (U.S. Const., amend. VI.) This protection has been applied to the States through the fourteenth amendment due process clause. (*Klopfer v. North Carolina* (1967), 386 U.S. 213, 18 L. Ed. 2d 1, 87 S. Ct. 988.) Moreover, the Illinois Constitution of 1970 provides the accused with a post-indictment right to a speedy trial. Ill. Const. 1970, art. I, §8.

In *Barker v. Wingo* (1972), 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182, the court established a four-point balancing test to apply to speedy trial challenges. These factors are "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U.S. 514, 530, 33 L. Ed. 2d 101, 117, 92 S. Ct. 2182, 2192. To measure delay, the court must consider the time between when defendant is first charged with the offense, whether by arrest, complaint or indictment, and when trial commences. (*Dillingham v. United States* (1975), 423 U.S. 64, 46 L. Ed. 2d 205, 96 S. Ct. 303; see also *People v. Kennedy* (1976), 39 Ill. App. 3d 323, 350 N.E.2d 482.) In the instant case, defendant complains of the 27-month delay between his arrest and the State's filing of a petition for adjudication of wardship. We note that there was an additional delay of roughly four months between the filing of this petition (March 16, 1977) and the commencement of trial (July 1977). The exact amount of delay, however, is not vital to our determination. As stated in *Barker*:

> "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. * * *" (407 U.S. 514, 530, 33 L. Ed. 2d 101, 117, 92 S. Ct. 2182, 2192.)

Assuming, *arguendo*, that the delay was presumptively prejudicial, we find that an analysis of the other factors indicates defendant was not denied his right to a speedy trial.

The State assigns a twofold reason for delay: (1) an oversight as to defendant's age, and (2) numerous delays and continuances attributable to defendant. This first justification must be characterized as neglect. The *Barker* court assigned different weights to different reasons for delay:

> "* * * A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. *A more neutral reason such as negligence * * * should be weighted*

*less heavily* but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. * * *" (Emphasis added.) (407 U.S. 514, 531, 33 L. Ed. 2d 101, 117, 92 S. Ct. 2182, 2192.)

While the State's first offered justification is, at best, "neutral," defendant's efforts to postpone trial constitute a more valid reason for the State's delay.

Moreover, defendant's responsibility for continuances and pretrial delay concerns the third factor of the *Barker* test: his assertion of his right to a speedy trial. Defendant was arrested on November 26, 1974. On February 13, 1975, defendant agreed to a continuance of trial. This was the first of 16 continuances (14 by agreement and 2 on defendant's motion) from February 1975 until the transfer of the cause on February 23, 1977. Defendant also filed various pretrial motions. He demanded trial for the first time on February 20, 1976. Defendant was represented by counsel throughout this time span. The language of *Barker* is significant:

"* * * The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." (407 U.S. 514, 531-32, 33 L. Ed. 2d 101, 117-18, 92 S. Ct. 2182, 2192-93.)

Moreover:

"We do not hold that there may never be a situation in which an indictment may be dismissed on speedy trial grounds where the defendant has failed to object to continuances. There may be a situation in which the defendant was represented by incompetent counsel, was severely prejudiced, or even cases in which the continuances were granted *ex parte*. But barring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial. * * *" (407 U.S. 514, 536, 33 L. Ed. 2d 101, 120, 92 S. Ct. 2182, 2195.)

We find no extraordinary circumstances present in the instant case and share the *Barker* court's reluctance to release a defendant who did not want a speedy trial.

Finally, we turn to defendant's allegations of prejudice incident to delay. The Supreme Court in *Barker* has recognized three interests of defendants which the speedy trial right was designed to protect: (1) the prevention of oppressive pretrial incarceration; (2) minimization of a

defendant's anxiety and concern; and (3) limitation of the possibility that the defense will be impaired. (407 U.S. 514, 532, 33 L. Ed. 2d 101, 118, 92 S. Ct. 2182, 2193.) Defendant was incarcerated for 30 days after his arrest. The remainder of the time he was out on bond. While this incarceration may have been unwarranted if defendant was prosecuted under the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, pars. 703—1 through 703—6), we do not view 30 days as excessive or oppressive in a speedy-trial context.

Defendant concedes that there is no evidence in the record to show specifically that his defense was impaired by the delay. Thus, he asserts that pretrial anxiety is the form of prejudice supportive of his speedy trial claim. Defendant also indicated that during the 27-month delay his employment (and compensation) was disrupted because of court appearances. He testified that he appeared, on the average, once or twice each month. Additionally, he was unable to join the armed forces as desired. (See also *United States v. Marion* (1971), 404 U.S. 307, 30 L. Ed. 2d 468, 92 S. Ct. 455, concerning other aspects of pretrial prejudice.) Finally, defendant alleges that he has suffered substantial prejudice because he did not obtain a juvenile transfer hearing when he was 17. We have discussed this contention above and do not consider it in the resolution of the speedy trial issue.

We also note that defendant concedes that no statutory or "term" speedy trial issue exists. (Ill. Rev. Stat. 1977, ch. 38, par. 103—5.) As a practical matter, the statute operates to prevent the constitutional issue from arising, except in cases involving extreme delays or novel issues. (*People v. Nowak* (1970), 45 Ill. 2d 158, 258 N.E.2d 313; *People v. Love* (1968), 39 Ill. 2d 436, 235 N.E.2d 819.) Generally, so long as an accused is tried within the statutory period he is not deprived of his right to a speedy trial. *People v. Plazewski* (1971), 2 Ill. App. 3d 378, 276 N.E.2d 459.

■■ Balancing the foregoing factors, we hold that defendant was not deprived of his right to a speedy trial. The 27- or 31-month delay was not oppressive where the prosecution was within the statute of limitations, defendant was free on bail pending trial, delay was not purposefully incurred, prejudice was minimal and defendant, for a great part of the period, did not request trial.

■■ Defendant's third contention is that, because he was indicted before the filing of a petition in the juvenile court, he was prosecuted on a void indictment. He raises the exact issue resolved by this court in *People v. Banks* (1976), 42 Ill. App. 3d 318, 319, 356 N.E.2d 121 (followed in *People v. Jones* (1979), 68 Ill. App. 3d 44, 49, 385 N.E.2d 392):

"* * * [W]hether the indictment is valid and the trial court had jurisdiction of the subject matter when a petition was not first filed

in the juvenile division alleging commission of this offense before defendant's case was transferred to the criminal division; * * *."

*Banks* involved a similar error in procedure by the State. Defendant was 16 at the time of the alleged offense, but 17 at the time of his indictment. He filed a motion to dismiss the indictment because no transfer petition had been filed in juvenile court. The State then filed a transfer petition and the juvenile court transferred the case to the criminal court. Thereafter, the trial court denied the petition to dismiss the indictment. On appeal, this court stated (42 Ill. App. 3d 318, 320, 356 N.E.2d 121, 123):

"* * * Although the better procedure is to file the petition before seeking an indictment, we hold that this deviation, standing alone, is not of such magnitude as to require a reversal. * * *"

We believe the *Banks* holding is dispositive of defendant's contention. See also *People v. Gooden* (1977), 56 Ill. App. 3d 408, 371 N.E.2d 1089 (where the suggested procedure at the time defendant's true age was established was a transfer to the juvenile division).

Moreover, in *People v. Nichols* (1978), 60 Ill. App. 3d 919, 377 N.E.2d 815, the defendant argued that the criminal court was without jurisdiction where Nichols was a juvenile at the time of the commission of the offense. The court stated (60 Ill. App. 3d 919, 922, 377 N.E.2d 815, 818):

"* * * However, we can not agree with the defendant that the indictment should have been dismissed because the trial court lacked jurisdiction. The juvenile court is merely a branch of the circuit court and it is the circuit court, as a whole, which is vested with jurisdiction. Whether a person is to be tried in juvenile or criminal court is a matter of procedure. [Citation.]"

Defendant's fourth contention is that the criminal court erred in denying his pretrial motion to suppress statements. The motion alleged that no *Miranda* rights were given defendant and that defendant was incapable of appreciating any *Miranda* rights given him. Defendant further alleged that the statements were obtained through psychological, mental and physical coercion and as a result of material misrepresentations of fact.

Concerning this motion, the following testimony was adduced: Investigator Daniel Alesi testified that on November 26, 1974, at about 8 p.m., he and his partner, John Dorn, arrested defendant. Defendant was placed in the back seat of the squad car, advised of his *Miranda* rights and stated that he understood each right. According to Alesi, while enroute to Area 6 headquarters, defendant asked why he was under arrest. Alesi stated that defendant was arrested for the armed robbery, kidnapping and aggravated battery of Mr. Hartstein. Defendant replied, "I was there but I didn't beat him."

Alesi further testified that neither he nor his partner ever drew their guns, placed a gun to defendant's head, opened the car door while moving, or threatened defendant with harm if he didn't make a statement. Neither officer struck defendant, nor was any physical or mental coercion employed. Alesi testified that after defendant was advised of his *Miranda* rights, he at no time indicated that he did not want to talk or that he wished to see an attorney first. Alesi stated that at police headquarters defendant was asked if he wanted to make a written statement relative to the statement he made in the car. Defendant responded that he did not. Alesi maintained that no conversation as to the offense took place during a second transporting of defendant to the 18th District police station.

Investigator Lee Epplen testified that during November 1974 he was assigned to Area 6. He was working with Joseph Molitor, who at the time of the hearing was a police officer in Wisconsin. Epplen testified that he spoke to Alesi concerning defendant's arrest and proceeded to arrange a lineup at the 18th District for complainant Hartstein to view. Hartstein identified defendant as one of the offenders. After the lineup, Epplen informed defendant he had been identified as a participant by Hartstein. Epplen then informed defendant of his *Miranda* rights. Defendant stated that he understood each right. Epplen again told defendant he had been identified and told him he had been implicated by William Betts, an accomplice already in custody. Epplen asked defendant what "his story was" and defendant replied that he participated in the robbery but did not beat Hartstein. At approximately 10:45 p.m., Epplen asked defendant if he wished to make a written statement and sign it. Defendant responded he did not.

Epplen also testified that he at no time struck defendant nor did he see anyone else do so. Defendant had no bruises on his body and did not complain of mistreatment by the arresting officers. Epplen did not recall being told by the arresting officers that defendant had refused to make a written statement.

Investigator John Dorn, Alesi's partner, substantially corroborated Alesi's account of the arrest, transportation and processing of defendant. However, according to Dorn, he told defendant Betts had implicated him before defendant made the first oral statement. At Area 6 headquarters Dorn asked defendant if he wanted to make a written statement concerning the incident. Defendant said no and he didn't want to talk about the incident any more. On redirect examination, Dorn explained that defendant's reluctance concerned the police request that he make a written statement. Dorn did not tell Epplen that defendant was not to be questioned.

Two issues are raised by the above sequence of events: (1) whether

the evidence demonstrates that defendant's *Miranda* rights were violated when he made the second statement, and (2) whether the trial court erred by not compelling Molitor to testify.

Defendant concedes that he was given the necessary warnings prescribed by *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, before the two separate periods of questioning. He asserts, however, that after telling the arresting officers he was at the scene of the crimes but did not beat the complainant, he invoked his right to remain silent. If defendant did indeed invoke his right to remain silent, this knowledge must be imputed to Epplen, who initiated the questioning the second time. (*People v. Medina* (1976), 37 Ill. App. 3d 1029, 347 N.E.2d 424, *affirmed* (1978), 71 Ill. 2d 254, 375 N.E.2d 78.) Moreover, *Miranda* directs (384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627-28):

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. * * *"

*Miranda* points out that both the warnings and the waiver required were, in the absence of a fully effective equivalent, prerequisites to the admissibility of a defendant's statement. We believe that with respect to waiver, the instant case is analogous to *People v. Johnson* (1969), 112 Ill. App. 2d 148, 155-56, 251 N.E.2d 393 (followed in *People v. Higgins* (1972), 50 Ill. 2d 221, 226-27, 278 N.E.2d 68, *cert. denied* (1972), 409 U.S. 855, 34 L. Ed. 2d 100, 93 S. Ct. 195, and *People v. Fultz* (1975), 32 Ill. App. 3d 317, 338, 336 N.E.2d 288). In *Johnson*, adequate warnings were given defendant and he expressly stated that he understood each right as it was read to him. Defendant then gave an oral inculpatory statement without an attorney present, but refused to make a written statement. The court held that the record demonstrated waiver and focused (1) on defendant's express statement that he understood each constitutional right, and (2) on defendant's refusal to make a written statement because that refusal demonstrated his actual awareness and knowledge of his constitutional rights and his ability to exercise them and thus defendant, by making his oral inculpatory statement and by refusing to make a written statement, demonstrated a similar knowledge and ability as to waiver of these rights.

The evidence is uncontradicted in the record before us that before

each of the two statements and after each right was read to defendant, defendant expressly stated that he understood that constitutional protection. Defendant clearly fell within the second part of the *Johnson* waiver test in that he refused to make a written statement on two occasions.

Defendant argues that there was no waiver because the record suggests he expressly invoked his right to remain silent. We disagree. Defendant neither testified nor presented any evidence on the motion. His only attempt to support his contention by reference to the record concerns Dorn's testimony that at the Area 6 station defendant stated he did not want to talk about the incident any more. However, on redirect examination, Dorn explained that defendant's reluctance only concerned making a written statement. Accordingly, we concur with the trial court's finding of fact that defendant's refusal to put a previous statement into writing did not amount to a request to remain silent. See *North Carolina v. Butler* (1979), \_\_ U.S. \_\_, 60 L. Ed. 2d 286, 99 S. Ct. 1755.

■■ In any event, even if the second oral statement should have been suppressed, the error was harmless beyond a reasonable doubt. Defendant does not contest the admissibility of his first oral statement. The second statement to Epplen was essentially the same in content as the first statement made to Alesi and Dorn. Accordingly, testimony as to the second statement was merely cumulative and could not have affected the verdict. *People v. Hall* (1976), 40 Ill. App. 3d 56, 351 N.E.2d 639.

Defendant also asserts that his second statement should be suppressed because a material witness was not called. He maintains that he had the right to confront Officer Molitor, who was with Officer Epplen when the second statement was made.

■■ When the voluntary nature of a confession is brought into question by a motion to suppress, the State must produce all material witnesses connected with the taking of the statement or explain their absence. (See *People v. Armstrong* (1972), 51 Ill. 2d 471, 282 N.E.2d 712, and cases cited therein.) Molitor's absence was explained by Epplen and the prosecutor in that he was presently a police officer in Wisconsin.

We need not decide if this justification for not producing Molitor was adequate, as any error was clearly not reversible. (See *In re Lamb* (1975), 61 Ill. 2d 383, 336 N.E.2d 753, *cert. denied* (1976), 425 U.S. 938, 48 L. Ed. 2d 180, 96 S. Ct. 1672.) The Illinois Code of Criminal Procedure (Ill. Rev. Stat. 1973, ch. 38, par. 114—11(b)) requires that a motion to suppress "be in writing and state facts showing wherein the confession is involuntary." Defendant's written motion alleges only:

> "6. That the statements sought to be suppressed were obtained as a result of physical coercion illegally directed against the Defendant and that such statements were, therefore, involuntary.

7. That the statements sought to be suppressed were obtained as a result of psychological and mental coercion illegally directed against the Defendant and that such statements were, therefore, involuntary."

Moreover, the record indicates that prior to a hearing on the motion to suppress the prosecutor moved that these paragraphs be stricken unless defense counsel would set forth with specificity what facts constituted coercion and which officers were involved. Counsel for the State and the defense initially agreed that the only coercion alleged concerned specific physical acts that took place during defendant's transportation after arrest to Area 6 headquarters and his transportation from Area 6 to the 18th District station. This was the basis of the allegation in paragraph 6. Thus, only officers involved in defendant's transportation would be material witnesses. Subsequently, however, defense counsel argued that the mental coercion alleged in paragraph 7 occurred with respect to the taking of the second statement. The trial court ordered defense counsel to specify the facts concerning these allegations. Counsel responded that the mental coercion consisted of the amount of time defendant was questioned, tricks and ruses, and the lack of food and sleep. The State contended the allegations as amplified by counsel were still too general. We also note that the State expressed willingness to call any witness deemed necessary by the court, including Officer Molitor.

■■ We deem the foregoing circumstances sufficiently analogous to the situation before the court in *In re Lamb* (1975), 61 Ill. 2d 383, 392, 336 N.E.2d 753, 758:

"While it would have been preferable to have had the benefit of Officer Blackley's testimony, we do not regard its absence, in the circumstances of this case, as reversible error. Given the lack of specificity in the motion to suppress and the resulting inability of the State to determine in advance of respondent's testimony which of its witnesses would be essential, the uncertainty whether Officer Blackley was even present at the time of the alleged coercion, the State's explanation of his absence and expressed willingness to call any witnesses deemed necessary by the court if a continuance were allowed, together with the equivocal nature of defense counsel's comments regarding Officer Blackley's absence, we believe the trial court's action was not unreasonable."

Molitor's status as a witness was not entirely clear. The State was not apprised what coercion, if any, occurred during the taking of the second statement, when Molitor was present. Accordingly, under *Lamb* no prejudicial error occurred.

■■ Defendant's final contention is that since he was 16 years old at the time of the offense, he should have been sentenced to the Juvenile

Division of the Illinois Department of Corrections. The governing statute was section 5—8—6(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—6(c)), which provided in pertinent part:

"All offenders under 17 years of age sentenced to imprisonment shall be committed to the Juvenile Division of the Department of Corrections and the court in its order of commitment may set a minimum and maximum limit of an indeterminate term or shall set a definite term. * * *"

Subsequent to oral arguments, the supreme court resolved this issue in *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366. The court considered the offender's age when sentenced to be the relevant criterion. Twin policy considerations dictated this result: "to protect the offender who is under 17 from the hardening influence and possible abuse from fellow inmates in the adult penitentiary system and to protect those committed to the Juvenile Division from being preyed on by inmates over 17." (76 Ill. 2d 289, 310, 391 N.E.2d 366, 375.) Since defendant was 17 at the time of sentencing, he was properly committed to the Adult Division of the Department of Corrections.

For all of the aforementioned reasons, the convictions and sentences of the circuit court of Cook County are affirmed.

Affirmed.

McGLOON and CAMPBELL, JJ., concur.